Filed 3/7/23  P. v. Loftin CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL CLARENCE LOFTIN,<br><br>        Defendant and Appellant. | A161290<br><br><br>(Del Norte County<br>Super. Ct. No. CRF 18-9311) |

Defendant confessed to killing Romeo Glaze.  A jury found him guilty of first degree murder and found true the alleged gun enhancements.  On October 27, 2020, the trial court sentenced defendant to 25 years to life for first degree murder and a consecutive term of 25 years for the firearm enhancement, under Penal Code section 12022.53, subdivision (d).  On appeal, defendant complains of various evidentiary errors, ineffective assistance of counsel, instructional errors, prosecutorial misconduct, and cumulative error.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    *Prosecution Case***

On March 26, 2014, Romeo "Bo" Glaze's sister reported to law enforcement that he was missing.  The same day, California Highway Patrol officers located a burned truck in Crescent City.  The truck was reported

1

stolen by defendant's mother.  In the bed of the truck, the police found a substance that appeared to be burned carpeting.

On April 15, 2014, Yurok Tribal Police Officers Davis and Donahue found a human skull and other remains over a dirt berm along Highway 169 in Klamath.  The skull had a bullet hole in it, above and behind the left ear.  The DNA from the remains matched a sample from Glaze.  Three bullet fragments were recovered from Glaze's skull.  The People's expert criminalist testified that the bullet was a .22-caliber long rifle bullet, which may be fired by a rifle or a .22-caliber revolver.  Smaller caliber bullets, such as a .22-caliber bullet, create less potential back spatter than higher caliber bullets.  He further testified in response to hypothetical questions:  If a shooter comments that he or she thought blood would go everywhere but it did not, that is consistent with minimal back spatter; if a shooter removes carpet and paints walls at the scene of a shooting, law enforcement will be less likely to find blood; and if a victim is shot while on a tarp, the likelihood of finding blood at the scene is also reduced.

On April 16, 2014, police officers searched defendant's residence, where he lived with his mother and adult sister, who has Down syndrome.  Defendant was not home, but his mother and sister were present.  The mother's bedroom and the sister's bedroom were furnished.  A third bedroom had no furniture, smelled of fresh paint, contained carpeting tools, and had carpeting that was a different color than the carpet in the rest of the home.  Remnants of old carpet padding were underneath the carpet.  No blood was found at the scene.

Nearly two years later, in March 2016, an informant led law enforcement to a wooded area near Hiouchi, where they recovered carpet padding consistent with the remnants attached to the floor of the

2

unfurnished bedroom in the defendant's residence.  The recovered padding was about the same size as the unfurnished bedroom.  The padding was tested for latent blood stains, but the tests were inconclusive.

On June 6, 2018, defendant was arrested for first degree murder.  In a videotaped police interview conducted the same day, defendant confessed to killing Glaze.  The videotaped interview was played for the jury.  The transcript of the video states that defendant told Lieutenant Schneck that he knew Glaze.  Defendant felt bad for Glaze because Glaze said he was homeless and his family did not care about him.  Glaze slept at defendant's home, ate his food, and used his shower.  Glaze helped defendant's mother with errands and yard work.  However, defendant did not trust Glaze. Defendant learned that Glaze and "this little crew . . . would . . . run around and get information on houses and how to rob them, get into them, take advantage of the people who had the houses, and then they would turn around and go sell that stuff."  Defendant had heard that they robbed and shot a man who resisted.

The day or night before the homicide, defendant told Glaze he would not be home and that Glaze should not come over.  The night of the homicide, defendant ended up staying home.  He was in his bedroom, "tweaking . . . ." Glaze, who was with Ben R.[1] the night before, knocked on defendant's door. When defendant answered, Glaze looked surprised to see him at home.  Glaze had a bicycle and some type of large machine in his hand.  Glaze asked defendant if he had seen Ben R., and defendant said, " 'Man, what do you mean have I seen Ben?  You know I don't get along with Ben.  What are you

_____

[1] Defendant explained that he did not get along with Ben R. because he "did that same kind of stuff."  "He lures you in with trust and then tries to get over on you . . . ."

3

talking about?' " It was raining, and defendant thought Glaze looked hungry. Defendant invited Glaze inside and gave him some food. Defendant left Glaze in the dining room to eat, and defendant went back to his bedroom. Defendant thought Glaze was acting "weird." He explained: "I've seen people how they act before they're about to do something crazy . . . ." "You don't act the same as you normally do. He's not happy, he's not jokey, he's not asking me about dope . . . ." "He's like checked out." Then, defendant heard the sound of the deadbolt on the front door open. Defendant grabbed his .22-caliber handgun, which he kept on a top shelf in his room, and he put it in his jacket. Then he quietly walked out of his room and saw Glaze leaning out of the front doorway. Defendant asked Glaze who was outside, and Glaze said no one. Defendant said, " 'Quit fuckin' playing with me, Bo, who's out here? What are you doing? . . . This is my mom's house. This is where my mom and my Down Syndrome sister stay, bro. What are you doing?' " Again, Glaze said, " 'Nothing . . . .' "

Defendant walked outside and saw a car behind a bush in the next-door neighbor's driveway. Defendant looked at Glaze and said, " 'Okay, bro, you're going to come to my mom and my sister's house and act like this, bro, when you think I'm not here.' . . . 'What's going on, Bo?' " Glaze continued to deny anything was going on. Defendant walked toward the car. When he was about halfway to the car, he heard the car doors close and saw the car drive away. Defendant thought, "[T]his mother-fucker really tried to come rob my mom, thinking I was gonna be gone."

Defendant was worried about his mother and sister, who were at home with him. He was worried Glaze would keep trying to come back to steal his

4

mother's belongings.  He sent his mother and sister away.[2]  Defendant kept asking Glaze what was going on:  " '[W]hy are you asking me where the fuck Ben [R.] is at and he's parked outside my house?  Why is his white little car driving off from my house and you're sitting here asking me where he is?' "  Glaze continued to deny anything was going on.  At one point Glaze was standing behind defendant, and defendant yelled at him, " 'Quit fuckin' standing behind me, bro.  Why are you fuckin' acting like that?' "  Glaze kept trying to do it, but then "finally he quit."  After defendant's mother and sister left, defendant kept thinking that if he "let [Glaze] go he's gonna come back."  He thought about it for "[a] long fucking time," but not hours.  Defendant "sat there and pondered it."  One side of his brain said to "just let it go," and "[t]he other side of me was like, see what he's doing right there, he's never gonna stop.  He's just gonna wait and wait and wait.  He's just that thorn in your side you've always got to worry about if you don't take care of it.  I just, and all of a sudden I just thought what if he comes back and my mom ends up getting hurt or my sister ends up getting hurt?  And I was like, I've got to stop that at all costs."

Defendant "made that decision that this has to be done, and [he] was just trying to find the guts to do it."  He stood next to Glaze and shot him once in the back of the head while he was "digging for socks."  "It was just real quick.  I was just like fuck it, and I reached over and bam."  Defendant said:  "I was all fucked up right then.  I was really thinking hard."  "I just had this thought, if he comes back he's gonna hurt my mom.  What if he does hurt my mom?"  "If I don't do it, it's never gonna get done."  The barrel of the gun was not far from Glaze's head.  Defendant expected "everything was going to

---

[2] At trial defendant testified that he told another person in the house (whom he did not identify) to leave with his mother and sister.

go everywhere, 'cause that's what it does in the movies," but it did not. Defendant watched the life go out of Glaze's eyes.

Defendant felt scared after he shot Glaze. Glaze was "doing some weird sound for a while," and defendant thought about taking him to the hospital. Defendant ended up taking Glaze somewhere he refused to disclose "[because he did not] want to get anybody in trouble." He said, "Some of the people I was with wanted to chop [Glaze] up," but defendant yelled at them to stop. At some point, defendant took Glaze's naked body and "drug him down the hillside in Klamath" and "left him facing his people's land" in Waukell.

Defendant did not know what happened to the gun he used. He thought someone got rid of it for him. He also did not know what happened to the carpet and padding in his bedroom. He said he did not go home for a long time after the shooting. He denied burning his mother's truck.

## II.    *Defense Case*

Defendant's trial testimony was largely consistent with his prior statement to the police. He was 37 years old at the time of his trial in 2020. He used methamphetamine off and on since age 14, but when he gave his statement to the police he had been clean and sober for 13 months. Defendant was high on methamphetamine for weeks leading up to the night of the homicide on March 9, 2014.[3] He was upset at the time because his wife left him.

Glaze was surprised when defendant answered the door. Glaze asked about Ben R. and told defendant he rode his bike across town because he got into a fight. He asked defendant if he had any "dope" or knew anyone who

---

[3] Defendant did not remember the specific date of the homicide, but he testified there was an earthquake that night and the trial court took judicial notice that there was an earthquake near Ferndale, California, at 10:18 p.m. on March 9, 2014.

would buy the metal machine he was holding.  Defendant's "spider sense was going crazy."  Glaze came into the house.  They both then went into defendant's bedroom to "hang out."  At one point, while defendant was bending over to clean up things in his room, Glaze was standing behind him, which defendant thought was "a jack move . . . ."  Glaze was "being weird and quiet," and defendant told him, " 'Get the fuck out from behind me.' "  At another point, defendant gave Glaze some food, which Glaze ate in the dining room, and defendant went back to his room.

Defendant then heard the deadbolt open and saw Glaze leaning out the front doorway, waving to someone.  This made defendant think he was being set up, and he "freaked out" on Glaze and asked him, " 'What the fuck are you doing?  Who the fuck is out here?' "  Defendant thought Glaze was the scout for the setup, "the trusted dude sent in to unlock the door."  Defendant walked out, into the yard.  He was scared, worried, and mad.  His mother and sister were home, and he did not know how many people were outside.  Defendant saw the silhouette of a car behind a hedge next to his driveway.  He then heard car doors slam and the car peel out and drive away.  Defendant was "fuckin' pissed" because he thought that Glaze was trying to rob his mother while defendant was supposed to be away.  He remembered being back in his room with Glaze, and he believed he told Glaze, " 'You need to get the fuck out of here before you get hurt.' "  Another family member arrived and told Glaze, " 'You need to get the fuck out of my grandma's house.' "  Glaze ripped off his shirt, and defendant thought Glaze and the other person[4] were going to start fighting.  Defendant did not want them to

_____

[4] Defendant did not identify by name the other person who arrived at his home (see footnote 2, *ante*, page 5).

fight in front of his mother. He told the other person to leave with his mother and sister, and they left. Defendant was then alone in the house with Glaze.

Defendant was irate. He asked Glaze to be honest with him, to tell him what was going on. Glaze "was just acting like [defendant] was trippin'." Defendant was scared. He was worried because he did not know "their plan B . . . ." He kept checking his windows, and at some point he sat on his bed, "kind of backed into the corner." Glaze was digging through a pile of things in defendant's room, and he asked defendant for drugs. Defendant "might have had [the gun] the whole time." He thought, "[Glaze has] got people out in the brush. I've got that fucker. I'm not letting it go. I'm not. Chase my mom out of the house. Fuck. I'm not letting that thing go. Those fuckers might come in kicking in the door and wonder where the fuck Bo is." Glaze looked up at defendant and asked him if he had any socks, and defendant "just thought, man, he didn't need socks to get here. It's all a fuckin' act." Defendant walked up to Glaze and shot him on the left side of his head. Defendant explained: "I ain't fuckin' playing with my girls. I'm not fuckin' playing when it comes to my girls. My mom, my sister, my wife, my baby. Fuck with me all you want. Don't fuck with my girls." When asked if he decided to kill Glaze, defendant said, "I mean, I guess I did. I don't know if I decided. It just . . . was kind of an action. It was a thought, a realization. Fuck that." He further explained: "I made the decision to protect my mom. Yeah." "That's why I killed him."

After Glaze was shot, he made a strange sound and defendant "freaked out and jumped out the window." Defendant accidently closed the window all the way and locked himself out. He walked across town to where his wife was staying. Then he went to a "dope house," where he talked to a friend. Next he went to a "home girl's house" and told her what happened. Someone

8

came to pick him up and drove him back to his house. Defendant wrapped Glaze's body in a tarp, put it in a vehicle, and drove to Klamath. He dragged Glaze's body over an embankment and left it face up. Then he went home and gave the truck back to his mother. Defendant denied being involved with burning the truck or removing the carpet and padding from his bedroom or painting his bedroom.

On the way back from Klamath, defendant spoke to a law enforcement officer he referred to as "Eagle Boy." Defendant gestured for the officer to pull over, and defendant told him, " 'Look, if you find a body down in Klamath, I did it.' " Defendant explained to the officer that he thought " 'he was going to come back and hurt my mom.' " The officer just looked at him, and defendant drove off.

On cross-examination, defendant admitted, without objection, that he had two domestic violence convictions in 2007 and 2012, an assault with a deadly weapon conviction in 2014, and a felon in possession of ammunition conviction in 2016. He also admitted to acts of violence while sober, including jail fights.

Defense expert forensic scientist Kenton Wong testified on direct examination that gunshots to the head typically bleed profusely, leaving a lot of blood at the scene, which is difficult to clean. He further testified that removing the carpet and padding from the scene of a shooting may help mitigate the amount of blood remaining at the scene. Also, if the person is shot while kneeling on a tarp, this would help mitigate and prevent the deposit of blood at the scene and facilitate the cleanup of the scene. However, there may still be back spatter. On cross-examination, Wong testified that if bleach were used in the cleanup, it could greatly reduce or preclude an investigator's ability to find and detect blood. He also stated that there is

9

less blood spatter when someone is shot in the head and there is no exit wound.

Sergeant Donahue of the Yurok Tribal Police testified that he saw defendant in March 2014 at a gas station in Crescent City. Sergeant Donahue was off duty and was with his two young sons. Defendant came up to him, and they had a conversation while Donahue was pumping gas. Defendant was sweating profusely, he was fidgety, and his eyes were bulged out. Donahue thought defendant was under the influence of a stimulant such as methamphetamine. Because of the way defendant was acting, Donahue was scared for the safety of himself and his children. Donahue left as soon as he finished pumping his gas.

## DISCUSSION

### I. *Evidentiary Issues*

#### A. Trial Court Did Not Err by Excluding Social Media Message from Victim

Defendant contends the trial court prejudicially erred by excluding a social media direct message from Glaze to R.N. We find no abuse of discretion.

#### 1. Additional Facts

The People filed a motion in limine seeking to exclude a message Glaze allegedly sent to R.N. around the time frame that Glaze disappeared. The message, which R.N. read aloud from her cell phone during a recorded police interview,[5] stated: "I'm in Crescent City on two wheels. Jackin the rich and

---

[5] The People's motion in limine acknowledged that the People did not object to using transcripts as a substitute for any photos of the messages that may have been taken but not preserved. The People further stated at the evidentiary hearing that although it was not clear if the police detective took photos of the messages, the evidence was preserved through the transcript of

10

looking out for easy victims, and all this shit talking people are going to learn one way or another, they say we're thieves. I call it karma. Got dynamite." (*Sic.*) The People objected to the admission of the message based on hearsay, relevance and lack of foundation. Defense counsel argued that the statement indicated Glaze intended to commit burglary or robbery and that Glaze's character was relevant because it would "play into our defense when we present our case in chief." The People responded that the statement was irrelevant because defendant told Lieutenant Schneck that he shot Glaze out of fear of future harm, which was insufficient for self-defense or imperfect self-defense. The trial court agreed and excluded the statement.

2. Analysis

Evidentiary rulings are reviewed for an abuse of discretion and will not be disturbed absent a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) "Evidence is relevant if it 'ha[s] any tendency in reason to prove or disprove any disputed fact.' [Citations.] The trial court has broad latitude in determining relevance." (*People v. Howard* (2010) 51 Cal.4th 15, 31.)

Defendant now argues Glaze's message was relevant to show heat of passion, imperfect self-defense, and defense of habitation. According to defendant, Glaze's message that he was "jackin' people" corroborated defendant's testimony that he knew Glaze committed robberies with a crew and he believed Glaze came to his house to rob his mother and sister. We find no abuse of discretion. The defendant's recorded statement to the police did not support an imperfect self-defense theory. Defendant's only stated

the police interview with R.N. during which messages were read from R.N.'s phone.

11

concern was that Glaze would "come[] back" and potentially hurt his mother and sister. Fear of future harm does not support the giving of the imperfect self-defense instruction. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 [" ' " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future' " ' "].)

Neither the trial court nor the parties discussed the potential relevance of Glaze's statement based on theories of heat of passion or the defense of habitation. Defendant may not raise new theories of relevance for the first time on appeal. (*People v. Case* (2018) 5 Cal.5th 1, 44–45 [admissibility of evidence not reviewable on appeal absent an " ' "offer of proof . . . inform[ing] the trial court of the 'purpose, and relevance of the excluded evidence' " ' "]; Evid. Code, § 354 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless . . . [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to the court"].) Defendant's argument that the evidence would "play into our defense" did not explain to the trial court how the evidence was relevant to unarticulated theories of heat of passion or the defense of habitation. The trial court is not required to guess as to the potential relevance of evidence a defendant seeks to admit. Theories of relevance not advanced in the trial court are not preserved for appeal. (*People v. Case*, at pp. 44–45.)

## B. Character Evidence

Defendant argues the trial court erroneously admitted evidence of defendant's character for violence. The contested evidence came in through the testimony of defendant and the testimony of Sergeant Donahue, a defense witness. Specifically, defendant, after testifying on direct examination to having anger issues and to previously robbing people, was asked on cross-

12

examination if he had issues with anger, and he testified that he was "a pretty sick person, especially when I'm using drugs." Defendant was then asked on cross-examination, without objection, if he still committed acts of violence when not on drugs. He responded that he had been in jail fights and had slapped a man at a sandwich shop to make him give back tip money he tried to steal.

Sergeant Donahue was called by the defendant. Donahue testified that he encountered defendant at a gas station in March 2014 and that defendant appeared to be high on methamphetamine. On cross-examination, Donahue testified that due to defendant's behavior, Donahue was scared for the safety of himself and his two children who were with him. The prosecutor then asked if he was familiar with defendant's prior history. Defense counsel objected based on relevance and exceeding the scope of the direct examination. He did not object that the question called for improper character evidence under Evidence Code section 1101. The court overruled the relevance objection and stated that although the testimony exceeded the scope of the direct examination, the court would permit the question to avoid having to call the witness back. Donahue then responded that he knew "[v]ery little" about defendant's background. When asked if the little he knew involved violence, Donahue said yes and agreed that he tried to get away from defendant after he finished pumping his gas.

Defendant forfeited any objections not raised below. (Evid. Code, § 354.) To avoid forfeiture, defendant asserts his counsel was ineffective for not specifically raising an objection based on inadmissible character evidence. Even assuming, without deciding, that defense counsel was deficient in failing to object and/or that the trial court erroneously overruled counsel's relevance objection, defendant has failed to adequately establish prejudice

13

due to the complained-of testimony. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 [to prevail on claim of ineffective assistance of counsel, defendant must establish counsel's efforts fell below an objective standard of reasonableness and resulted in prejudice].) As the People note, defendant's criminal history was made known to the jury through the testimony of Lieutenant Schneck, who testified, without objection, that he arrested defendant twice prior to March 2014. Further, on direct examination, defendant testified to having anger issues ("I'm not a really calm person when . . . I get mad, you got to kind of beat me up to get me to listen." "It's just how I've always been.") and to robbing people ("I've robbed people." "I've got over on people. I've done my shit. So I know what's going on."), and he said, "I'm not a fuckin' saint . . . ." On cross-examination, defendant testified, without objection, that he had prior convictions for domestic violence in 2007 and 2012, assault with a deadly weapon in 2014, and felon in possession of ammunition in 2016.

On appeal, defendant does not assert that any of this other testimony regarding his anger issues and prior crimes was inadmissible. Indeed, much of the testimony was elicited during defendant's direct examination. He complains only that he was improperly questioned about acts of violence when not on drugs. Given defendant's testimony on direct examination about his violent history, we find it is not reasonably probable that the jury would have reached a more favorable outcome if defendant had not testified about additional acts of violence he committed when not on drugs. (*People v. Mai, supra,* 57 Cal.4th at p. 1009.) We further find that, on this record, it is not reasonably probable that the jury would have reached a more favorable outcome if the trial court had excluded Sergeant Donahue's brief testimony that he knew "[v]ery little" about defendant's background but knew it involved violence. (*Ibid.*) Any error was harmless.

Defendant also argues defense counsel was ineffective for failing to request CALCRIM No. 375, the limiting instruction given when evidence is presented of other crimes or bad acts under Evidence Code section 1101, subdivision (b).  As discussed *ante*, defendant's testimony regarding his anger issues and his history of robbing people was initially raised on direct examination.  When read in context, it appears that defendant's testimony regarding his prior bad acts was offered to explain why defendant was suspicious of Glaze ("I've robbed people."  "I've got over on people.  I've done my shit.  So I know what's going on.").  Thus, defense counsel may have had a tactical reason for not requesting CALCRIM No. 375.  However, even assuming defense counsel was deficient for failing to request the limiting instruction, we find defendant was not prejudiced by the omission.  (*People v. Mai, supra*, 57 Cal.4th at p. 1009.)  As discussed *ante*, defendant was not prejudiced by the introduction of the complained-of testimony regarding his prior crimes and bad acts.  Further, there was no question in this case as to whether defendant killed Glaze.  Defendant admitted shooting Glaze in the head while he was crouching down, digging through a pile of clothing to look for socks.  While the question of the degree of murder was at issue, the determination of that issue hinged on the defendant's recorded confession and his testimony about his state of mind at the time of the killing, which included his own statements that he "pondered" his actions.  Based on this record, we find that it is not reasonably probable that but for defense counsel's failure to request the limiting instruction regarding defendant's prior crimes and bad acts (CALCRIM No. 375) the outcome of the trial would have been more favorable to the defendant.  (*People v. Mai, supra*, 57 Cal.4th at p. 1009.)

15

## C. *Sanchez* Error Regarding Testimony About the Tarp

Defendant contends the defense expert, Kenton Wong, relayed inadmissible testimonial hearsay on cross-examination in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and his Sixth Amendment right to confrontation. We find that defendant's claim of *Sanchez* error was forfeited by his failure to object at trial. We further find that even if there had been no forfeiture, defendant's claim is without merit.

### 1. Additional Facts

In February 2017, Ronnie M. gave a recorded statement to the police. In June 2018, at the preliminary hearing, Ronnie M. asserted his Fifth Amendment right against self-incrimination and refused to answer nearly all of the prosecutor's questions. The prosecutor initially sought to introduce a portion of Ronnie M.'s recorded statement relating to an issue not raised on appeal, and the parties litigated the admissibility of a portion of Ronnie M.'s statement. The People later opted not to introduce the portion of Ronnie M.'s statement. The record on appeal does not include a transcript of Ronnie M.'s statement.

During trial, defendant called Kenton Wong, a forensic scientist and blood stain pattern analyst. On direct examination, Wong testified that he reviewed reports and transcripts provided to him regarding a shooting at defendant's residence. He testified that if a victim were shot in the head with a .22-caliber bullet that was recovered fully intact, he would expect that there would be a lot of blood, that it would flow profusely, and that it would be hard to clean. Removal of carpet and padding may help to mitigate and remove traces of blood, depending on how much blood was deposited and how quickly the cleanup occurred. Defense counsel then asked Wong a series of hypothetical questions involving various scenarios in which counsel's wife

16

shoots him. Counsel asked Wong to assume, hypothetically, that "[m]y wife detests me so much she makes me get a tarp out and lay it on the bedroom floor and makes me get on my knees on the tarp," and then counsel asked whether that would change Wong's analysis. Wong testified the tarp would help to mitigate and prevent the deposition of blood into the crime scene and that it would help facilitate the cleanup but that there may still be some back spatter.

The prosecutor cross-examined Wong as follows: "Q: Now, defense counsel did ask you to read the transcript of Ronnie [M.]. [¶] A: Yes. [¶] Q: Okay. So, hypothetically, if a victim was tricked to get on a tarp as a ruse to do some work in a room, say, and that victim was shot on the tarp, a tarp is something that would more than likely stop the blood from leeching into the carpet? [¶] A: That's potentially possible." The prosecutor then confirmed with Wong that painting the walls could cover potential spatter. He then continued: "Q: And what does the role of bleach have in a cleanup of blood? [¶] A: Bleach is used to commonly remove blood and clean up blood at crime scenes. [¶] Q: And is it effective? [¶] A: It can be, yes. [¶] Q: Okay. And in the transcript that [defense counsel] had you read of Ronnie [M.], did you see references to bleach being used?" At this point, defense counsel objected, "That's hearsay. It's not put in a hypothetical." The court stated that admissibility depended on whether Wong used the statement in formulating his opinion. The prosecutor then asked Wong whether he used Ronnie M.'s statement in formulating any opinions, and he replied he reviewed it but did not recall a reference to bleach. The prosecutor showed Wong the statement to refresh his recollection and then asked if using a lot of bleach would have precluded investigators' ability to detect blood, to which Wong responded affirmatively.

17

## 2. Legal Principles

*Sanchez* adopted the following rule:  "When any expert relates to the jury case-specific out-of-court statements, and treats the context of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth.  If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing."  (*Sanchez, supra*, 63 Cal.4th at p. 686.)  However, an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so."  (*Id.* at pp. 685–686.)  *Sanchez* explains:  "There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception. [¶] What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."  (*Id.* at p. 686.)

## 3. Analysis

Defendant argues that Wong was improperly asked hypothetical questions during cross-examination that were "based overtly on [Ronnie M.'s] statement . . . ."  He asserts that the prosecutor's question to Wong about whether, "if a victim was tricked to get on a tarp as a ruse to do some work in a room, say, and that victim was shot on the tarp, a tarp is something that would more than likely stop the blood from leeching into the carpet" was a hypothetical containing "case-specific facts relayed to the jury by Wong's

18

reliance on them . . . ." Defendant makes a similar complaint about the prosecutor's questions regarding the hypothetical "use of bleach" and the impact that could have on investigators' ability to recover blood. Defendant asserts the case-specific facts were inadmissible testimonial hearsay and the use of the statements violated his Sixth Amendment right to confrontation and Evidence Code sections 1291 and 1294.

Notably, regarding prejudice, defendant argues only that "[e]vidence that Glaze was 'tricked' into getting on a tarp before he was shot" made it more likely the jury would find premeditation and deliberation. He does not explain how he was prejudiced by Wong's testimony regarding the hypothetical use of bleach in cleaning up the crime scene. It is not entirely clear whether defendant is arguing that the prosecutor's questions regarding the tarp and his questions regarding the bleach were both prejudicial *Sanchez* errors. However, because he does not explain how he suffered any prejudice from the questions regarding the bleach, we find no error as to those questions. We focus our analysis of the alleged *Sanchez* error only on the questions regarding the tarp.

First, it appears that defendant forfeited any *Sanchez* error by not objecting when the prosecutor asked if Wong read Ronnie M.'s statement and then posed a hypothetical in which a victim is tricked to get on a tarp. (Evid. Code, §§ 353, subd. (a), 354; *People v. Demetrulias* (2006) 39 Cal.4th 1, 20 [" ' " 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable" ' "].) Defendant claims the issue was preserved because "[c]ounsel objected under Evidence Code section 1291, and repeatedly argued that he had no meaningful opportunity to cross-examine . . . ." Defendant does not provide a record citation to the claimed objection. (*Doppes v. Bentley Motors, Inc.*

19

(2009) 174 Cal.App.4th 967, 990 [rule requiring references to record "applies wherever a reference to a matter in the record appears in a brief"]; Cal. Rules of Court, rule 8.204(a)(1)(C).)  To the extent defendant is referring to counsel's objection at an evidentiary hearing outside the jury's presence regarding whether the prosecutor could introduce a different portion of Ronnie M.'s statement—a position the prosecutor later withdrew—we find this insufficient to preserve the *Sanchez* issue.  The record shows that defense counsel did not object to the prosecutor's cross-examination of Wong regarding the tarp issue.

Even if defendant had not forfeited the *Sanchez* issue, defendant's argument is without merit.  Defense counsel first elicited testimony from Wong that making a victim kneel on a tarp would help to mitigate and prevent the deposition of blood at the crime scene.  The testimony elicited by the prosecutor on cross-examination was essentially the same.  Further, on cross-examination, the prosecutor specifically prefaced his questioning regarding the tarp with the question, "And you don't know what was under the victim at the time he was shot; correct?"  Wong responded, "I do not."  Viewing Wong's testimony as a whole, we disagree that his response to a hypothetical regarding use of a tarp violated *Sanchez*.  Wong did not "relate as true case-specific facts asserted in hearsay statements . . . ."  (*Sanchez, supra*, 63 Cal.4th at pp. 685–686.)  Although Ronnie M.'s statement was mentioned in passing, Wong never revealed what Ronnie M. said.   Nor did Wong "treat[] the content of [Ronnie M.'s] statement[] as true and accurate to support" his opinion.  (*Sanchez, supra*, 63 Cal.4th at p. 686; see *People v. Bell* (2020) 47 Cal.App.5th 153, 194–195 [no confrontation clause violation established where record was not clear enough to decipher which portions of expert's testimony (if any) relied on testimonial hearsay].)  Instead, Wong

20

very clearly stated that he did not know what was under the victim, and then, when posed with a hypothetical that was initially introduced by the defense, Wong opined on the impact a tarp would have on the detection of blood at the scene.  There was no *Sanchez* error.

## II.   *Defense counsel's presentation of expert testimony was not ineffective assistance of counsel.*

Defendant contends that his counsel's presentation of Wong's expert testimony was ineffective assistance of counsel.  He argues that given his detailed confession, there was no point to Wong's testimony regarding blood loss and cleanup.  Defendant further argues that even if there were a legitimate reason for Wong's testimony, counsel's performance was deficient because he (1) asked Wong to assume damaging facts that were not in evidence; (2) did not properly prepare Wong; (3) elicited evidence that defeated the purpose of Wong's testimony; (4) made no effort to exclude hearsay that Glaze was tricked into getting on a tarp on which he was then shot; and (5) withdrew his request for CALCRIM No. 360, which would have told the jury not to assume facts in Ronnie M.'s statement were true.

To establish ineffective assistance of counsel, a defendant must show counsel's efforts fell below an objective standard of reasonableness and resulted in prejudice.  (*People v. Mai, supra*, 57 Cal.4th at p. 1009.)  In reviewing ineffective assistance claims, we defer to counsel's reasonable tactical decisions and presume counsel acted within the wide range of reasonable professional assistance.  (*Ibid.*)  To establish prejudice, defendant must show "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Ibid.*)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668,

694.) "A defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

We have reviewed Wong's testimony in its entirety, and although its purpose is not entirely clear, we find it neither helpful nor damaging to the defense. Wong essentially opined regarding the amount of blood that could be expected from a gunshot wound to the head and whether blood was likely to be detected at the crime scene after various possible cleanup scenarios. Given defendant's admission that he killed Glaze, Wong's testimony regarding blood loss and cleanup of crime scenes likely had little, if any, impact on the issues the jury decided. Defendant argues Wong's testimony was prejudicial because it signaled to the jury that defendant had no viable defense and that the "untested evidence that [defendant] executed Glaze by tricking him onto a tarp before the shooting was certainly prejudicial." As to the first point, we disagree that Wong's testimony, which even the defendant concedes focused on a "moot point" (the cleanup), was prejudicial.

We also disagree that defendant was prejudiced by the questioning of Wong concerning the tarp and defense counsel's failure to object during Wong's cross-examination on the basis that Ronnie M.'s recorded statement was inadmissible. Testimony about the impact of a tarp under the victim was first raised, without objection, when the prosecution questioned its own expert criminalist. Wong's testimony on this point was consistent with the testimony of the People's expert. They both testified to the unremarkable proposition that if a tarp were under a victim when the victim was shot, this could result in less blood at the scene. Defendant was also asked by the prosecutor, "Prior to shooting Bo, did you trick him to get on a tarp?" The trial court sustained an objection on the grounds that the question assumed a fact not in evidence, and the prosecutor then asked, without objection, "Did

you have Bo get on a tarp?" Defendant answered, "No. I rolled him up in a tarp." On appeal, defendant raises no issues regarding questions posed to himself or to the prosecutor's criminalist regarding whether a tarp was used or the impact the use of a tarp would have on the crime scene. We fail to see how similar questioning to Wong regarding the possible use of a tarp was prejudicial.

As discussed *ante*, although the prosecutor referenced a statement by Ronnie M., neither the prosecutor nor Wong revealed who Ronnie M. was or what Ronnie M. said. At most, the passing reference to Ronnie M. during the prosecutor's questioning of Wong regarding a tarp raised an inference that Ronnie M. may have referenced a tarp. But the jury also heard Wong specifically state he did not know if a tarp was used, and the jury was instructed with CALCRIM No. 332, which informed the jurors that they were to decide whether facts assumed in any hypothetical posed to an expert had been proven. Moreover, during closing argument, the People did not advance a theory that defendant forced or tricked Glaze to get on a tarp before he shot him. Nor did they mention a tarp or Ronnie M. The issue of when and how a tarp was used was not a focal point at trial.

As discussed *ante*, we find there was no *Sanchez* error. Therefore, defense counsel was not ineffective for failing to object to the prosecutor's questioning of Wong regarding the possible use of a tarp.

Defendant contends his counsel was ineffective for withdrawing his request for CALCRIM No. 360, but he fails to provide a record citation to defense counsel's withdrawal. (*Doppes v. Bentley Motors, Inc., supra*, 174 Cal.App.4th at p. 990; Cal. Rules of Court, rule 8.204(a)(1)(C).) Even if not forfeited, we find no merit to this claim. CALCRIM No. 360 instructs that when an expert testifies that he or she considered a statement made by

23

someone else in reaching his or her conclusions, the jury "may consider [that] statement[] only to evaluate the expert's opinion" and the jury is not to "consider [that] statement[] as proof that the information contained in the statement[] is true." (CALCRIM No. 360.) As discussed *ante*, Wong did not testify that he relied upon Ronnie M.'s statement, only that he read it. Nor did he reveal what Ronnie M. said. Thus, CALCRIM No. 360 was not applicable.

Having reviewed Wong's testimony, as well as the other evidence presented, we find that there is no reasonable probability that but for defense counsel's alleged deficient performance regarding Wong's testimony the outcome of the trial would have been more favorable to defendant. (*People v. Mai, supra*, 57 Cal.App.4th at p. 1009.) Thus, defendant's claim of ineffective assistance of counsel fails. (*People v. Fairbank, supra*, 16 Cal.4th at p. 1241 [" ' "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed" ' "].)

## III. *Alleged Instructional Errors*

Defendant alleges the trial court erroneously failed to instruct on voluntary manslaughter–heat of passion (CALCRIM No. 570), imperfect self-defense (CALCRIM No. 571), the defense of habitation (CALCRIM No. 506), and the presumption regarding use of force against an intruder into home (CALCRIM No. 3477). He also alleges that defense counsel was ineffective for failing to request an instruction on the mitigating effects of provocation (CALCRIM No. 522). As discussed *post*, we find no prejudicial instructional errors.

**A.** **Any error in failing to instruct on voluntary manslaughter based on a sudden quarrel or heat of passion was harmless.**

Defendant contends the trial court erroneously failed to instruct sua sponte on voluntary manslaughter–heat of passion (CALCRIM No. 570). He argues that although his trial counsel did not request this instruction, the trial court was required to give the instruction sua sponte as a lesser included offense of murder that was supported by substantial evidence. As discussed *post*, we question whether this record provides substantial evidence to support a voluntary manslaughter–heat of passion instruction. However, even assuming—without deciding—that substantial evidence supported the instruction, we find any error harmless beyond a reasonable doubt because the jury necessarily found defendant's actions were willful, deliberate and premeditated when it convicted him of first degree murder. (*People v. Peau* (2015) 236 Cal.App.4th 823, 829 (*Peau*).)

### 1.    Additional Facts

The trial court instructed the jury on first and second degree murder. Specifically, the trial court gave CALCRIM No. 520 (first or second degree murder with malice aforethought), which explains: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521." CALCRIM No. 521 (first degree murder) instructed the jury that the defendant was prosecuted for first degree murder under two theories: (1) the murder was willful, deliberate, and premeditated; or (2) the murder was committed while lying in wait. CALCRIM No. 521 further states: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The

defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the acts that caused death." It then explains that the length of time considering whether to kill is not alone determinative and that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." As to the lying in wait theory, CALCRIM No. 521 states: "The defendant murdered by lying in wait if: [¶] (1) He concealed his purpose from the person killed; [¶] (2) He waited and watched for an opportunity to act; [¶] AND [¶] 3. Then, from a position of advantage, he intended to and did make a surprise attack on the person killed. [¶] The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation." CALCRIM No. 521 concludes: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

The jury was also instructed with CALCRIM No. 3426 (voluntary intoxication), which states the jury may consider defendant's voluntary intoxication in deciding whether the defendant acted with intent to kill or acted willfully, deliberately, and with premeditation.

### 2. Legal Principles

A trial court has a sua sponte duty "to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149.) In a murder prosecution, the trial court's duty "includes the obligation to instruct on every supportable

26

theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied." (*Id.* at p. 149.) Substantial evidence is that which a reasonable jury could find persuasive. (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.) An instruction is not justified based on the existence of *any* evidence, no matter how weak. (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.) However, the testimony of a single witness, including the defendant, may suffice. (*Ibid.*)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "When a person kills while acting 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a))—even if exercising a sufficient 'measure of thought . . . to form . . . an intent to kill'—he or she acts with 'a mental state that precludes the formation of malice.' [Citation.] Thus, the offense of murder is reduced to the lesser included offense of voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion. [Citation.] A person acts upon a sudden quarrel or in the heat of passion if he or she 'acts without reflection in response to adequate provocation.' [Citation.] Provocation is legally adequate if it ' " 'would cause the ordinarily reasonable person of average disposition to act rashly and . . . from . . . passion rather than from judgment.' " ' [Citation.]" (*Peau, supra*, 236 Cal.App.4th at pp. 829–830.) "The passion aroused need not be anger or rage, but can be any intense emotion other than revenge. [Citation.]" (*People v. Dominguez* (2021) 66 Cal.App.5th 163, 175.)

3. Analysis

Defendant asserts his testimony supported the giving of the voluntary manslaughter–heat of passion instruction. Specifically, he argues there was evidence that Glaze was acting as the appointed "scout" in an effort to rob

27

defendant's mother and sister when Glaze believed defendant would not be home, that Glaze lied to defendant about whether others were outside, that Glaze refused to leave when told to do so, and that defendant was " 'mad' " and " 'yelling and yelling' " at Glaze. Defendant was angry that Glaze " 'tried to blindside [his] mother and sister in the middle of the night,' " and he worried that the others would return. We question whether, on this record, where defendant confessed that before he killed Glaze he "pondered" his actions and thought about it for "[a] long fucking time," where he was alone with an unarmed victim at the time of the killing, and where he shot the victim in the back of the head while the victim was crouching down and digging through a pile of clothing to look for socks, there is sufficient evidence to support an instruction that defendant's passion was "so strong that [his] reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.) However, we need not decide whether the trial court erred in not instructing sua sponte on heat of passion voluntary manslaughter because we find any such omission was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)[6]

Any error in failing to instruct on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to the defendant under other properly given

---

[6] The parties disagree on whether the failure to instruct on a lesser included offense is evaluated under the federal beyond a reasonable doubt standard (*Chapman v. California, supra*, 386 U.S. at p. 24) or the state law reasonable probability standard (*People v. Watson* (1956) 46 Cal.2d 818, 837). Our Supreme Court is currently considering this question (*People v. Schuller* (2021) 72 Cal.App.5th 221, 237–238, review granted Jan. 19, 2022, S272237). We need not decide the applicable standard because we find no prejudice even under the stricter *Chapman* standard.

instructions. (*Peau, supra*, 236 Cal.App.4th at p. 831, citing *People v. Lewis* (2001) 25 Cal.4th 610, 646.) Here, the jury found defendant guilty of first degree murder. It was instructed that it had to find beyond a reasonable doubt that defendant killed Glaze "willfully, deliberately, and with premeditation." (CALCRIM No. 521.) The jury was further instructed as to the meaning of willfulness, deliberation, and premeditation and that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." (*Ibid.*) Finally, the first degree murder instruction stated that if the People failed to prove these elements beyond a reasonable doubt, "you must find the defendant not guilty of first degree murder and the murder is second degree murder." (*Ibid.*) As explained by our Supreme Court in *People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*): "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction [that provocation could occur over time]." Here too the jury's finding that defendant was guilty of first degree murder necessarily determined that defendant premeditated and deliberated the killing, which is "manifestly inconsistent" with acting under the heat of passion. (*Ibid.*; see *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071–1072 [jury's finding that defendant premeditated and deliberated a killing was "manifestly inconsistent" with his having acted under the heat of passion, and omission of heat of passion instruction was harmless beyond a reasonable doubt]; *Peau, supra*, 236 Cal.App.4th at p. 830 [first degree murder conviction rendered any failure to give heat of passion instruction harmless under *Chapman*].)

29

Defendant argues *Wharton, supra*, is distinguishable because there the jury was given instructions on provocation and heat of passion and the error alleged and found to be harmless was the refusal to instruct that provocation could occur over a considerable period of time. (53 Cal.3d at pp. 569–572.) In contrast, defendant argues that here "*no* instructions informed the jury to consider whether [defendant] was provoked into committing the homicide under the heat of passion." However, the central point of *Wharton*'s analysis was that the jury's finding that the killing was willful, premeditated and deliberate was "manifestly inconsistent" with a killing done in the heat of passion. (*Id.* at p. 572.) The same is true here. In order to find defendant guilty of first degree murder, as opposed to second degree murder, the jury necessarily found that the killing was willful, deliberate, and premeditated and that the defendant did not make the "decision to kill . . . rashly, impulsively, or without careful consideration . . . ." (CALCRIM No. 521.)

Defendant urges us to follow *People v. Berry* (1976) 18 Cal.3d 509, which reversed a first degree murder conviction because the trial court erroneously refused to give a requested instruction on voluntary manslaughter on a heat of passion theory. (*Id.* at pp. 512, 518.) Defendant argues that as in *Berry*, here too the trial court's other instructions made only "passing reference" to the concept of heat of passion when they instructed that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." *Berry* states the other instructions given "only casually" referenced heat of passion and provocation in order to distinguish between first and second degree murder. (*Ibid.*) It concluded that "[t]here was no clear direction to the jury to consider the evidence of . . . provocatory conduct so as to determine whether defendant, as an ordinary man of average disposition [citation] having been exposed to such

30

conduct, was provoked into committing the homicide under a heat of passion." Thus, *Berry* concluded that the first degree murder conviction did not necessarily determine the factual question posed by the omitted instruction. (*Ibid.*)

In *Peau*, our colleagues in Division One rejected a similar argument urging the court to follow *Berry* instead of *Wharton*. *Peau, supra*, held that the failure to give a heat of passion instruction was harmless beyond a reasonable doubt because the jury's guilty verdict on first degree murder necessarily found the murder was willful, deliberate, and premeditated. (236 Cal.App.4th at pp. 831–832.) *Peau* acknowledged some tension between the holdings of *Berry* and *Wharton* but found that *Wharton*'s more recent reasoning was directly on point. (*Peau*, at p. 831.) *Peau* explained that the analysis in *Berry* never mentioned that first degree murder must be willful, premeditated, and deliberate and instead focused only on the " 'passing reference' " to heat of passion and provocation in the instruction distinguishing between first and second degree murder. (*Ibid.*) *Peau* found "this strongly suggests that the sole issue considered in *Berry* was whether the error was harmless because the jury received some instruction on the concepts of heat of passion and provocation, not whether the error was harmless because the jury found the murder was willful, deliberate, and premeditated and such a finding was inconsistent with a finding that the defendant acted in a heat of passion." (*Id.* at pp. 831–832.) We agree with *Peau*'s analysis and find that *Berry* does not preclude us from finding the alleged error here to be harmless beyond a reasonable doubt because the jury necessarily rejected the possibility that defendant acted in the heat of passion

31

when it convicted him of first degree murder.  (*People v. Brown* (2012) 54 Cal.4th 314, 330 ["cases are not authority for propositions not considered"].)[7]

## B. Counsel was not ineffective for failing to request instructions on the mitigating effects of provocation.

Defendant argues that his defense counsel rendered ineffective assistance by failing to request instructions that provocation (1) reduces a murder to manslaughter and (2) may reduce a first degree murder to second degree.

CALCRIM No. 522 is a pinpoint instruction that explains:  "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. . . ."  This instruction must be given upon request where there is substantial evidence to support the theory. (*People v. Wilkins* (2013) 56 Cal.4th 333, 348–349.)

Here again we question whether the record, which includes defendant's multiple references to his deliberative thought process, contains sufficient evidence to support an instruction that defendant's passion was "so strong that [his] reaction bypassed his thought process to such an extent that judgment could not and did not intervene."  (*People v. Beltran, supra*, 56 Cal.4th at p. 949.)  However, even assuming—without deciding—that counsel's performance was deficient because he failed to request instructions regarding provocation, defendant fails to establish that he was prejudiced by

---

[7] Defendant cites *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488, which relied upon *Berry* to reject the argument that a conviction of first degree murder rendered the failure to give a heat of passion instruction harmless.  We disagree with *Ramirez* for the reasons discussed *ante*.

counsel's conduct. Based on the evidence, and given the other instructions which defined willful, deliberate and premeditated conduct and which explicitly stated that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated," we find it is not reasonably probable that the verdict would have been more favorable to defendant if the jury had been instructed with CALCRIM No. 521. (*Strickland v. Washington, supra*, 466 U.S. at pp. 687–688.)

### C. Refusal to instruct on imperfect self-defense was not error because no substantial evidence supported the instruction.

#### 1. Additional Facts

Defendant's counsel requested that the trial court instruct on voluntary manslaughter–imperfect self-defense or imperfect defense of another (CALCRIM No. 571). Defense counsel conceded that defendant testified that his mother and sister had left by the time he killed Glaze and, thus, his fear regarding their safety was of the potential for future harm. However, defense counsel argued that the evidence showed defendant was also afraid for himself because he did not know what Glaze and the others' "plan B" was. The trial court agreed with the prosecution's argument that the evidence did not show defendant acted out of any imminent danger, and it declined to give the instruction.

#### 2. Legal Principles

Imperfect self-defense voluntary manslaughter occurs when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1226.) CALCRIM No. 571 instructs that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/ [or]

33

imperfect defense of another).” A defendant acts in imperfect self-defense if (1) he or she actually believed that he or she was in imminent danger of being killed or suffering great bodily injury and (2) he or she actually believed that the immediate use of deadly force was necessary to defend against the danger but (3) at least one of those beliefs was unreasonable. (CALCRIM No. 571.) Belief in future harm, even if in the near future, is not sufficient to warrant the instruction. (*People v. Manriquez, supra*, 37 Cal.4th at p. 581.)

 3. Analysis

We independently review the trial court’s decision not to instruct on a lesser included offense. (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.) We must determine whether there was substantial evidence from which a jury could conclude that the lesser offense of voluntary manslaughter–imperfect self-defense, but not the greater offense of murder, was committed. (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)

Defendant acknowledges there was substantial evidence that he was afraid Glaze would cause future harm to his mother and sister, and the record is replete with defendant’s statements indicating this fear of future harm.[8] However, defendant argues there was also substantial evidence that he thought he was in imminent danger and had to kill Glaze to avoid that

---

 [8] Defendant’s recorded statement to Lieutenant Schneck included the following statements: “I just kept thinking if I let him go he’s gonna come back.” “I just thought what if he comes back and my mom ends up getting hurt or my sister ends up getting hurt? And I was like, I’ve got to stop that at all costs.” Similarly, at trial he made repeated references to his concern for his mother and sister, including the following: “What if he comes back and tricks [my sister] into opening the door and my mom is fuckin’ sleeping?” “I understand it’s not a good defense or anything. It’s not a good reason. What if he comes back and hurts my mom. [¶] And when I thought that, I was just, like, fuck that. I’m not gambling with my mom’s safety. And I get it. It’s not a good reason.”

34

imminent danger. Defendant claims the substantial evidence supporting imperfect self-defense was his belief that Glaze was trying to commit a robbery with the others whom Glaze denied were outside and his knowledge that Glaze and his "crew" had previously harmed robbery victims. Further, defendant testified Glaze stood behind him and this made him think Glaze was trying to "get the drop" on him. Defendant also argues that after Glaze was told to leave, he "assumed a fighting stance . . . ." The testimony to which defendant cites states that when another person told Glaze to leave, Glaze ripped off his shirt and defendant thought Glaze and the other person were about to start fighting. At that point, defendant told the other person to leave with his mother and sister, and they left. Defendant points to no testimony that Glaze ever attempted to fight with him. In fact, defendant testified that he did not have any right to kill Glaze.

Defendant also argues there was evidence that "[h]e was concerned they might come through the door to assist Glaze, and was concerned that they, with Glaze, had a 'plan B.' " Defendant cites to his testimony that "anything could go down. I don't know what's going on. I don't know what their plan B is." Defendant did not testify to a specific concern about people coming "through the door." To the contrary, defendant's own testimony was that he saw a car silhouette behind a hedge next to his house and he heard the car doors slam and the car drove away.

We agree with the trial court that the evidence does not support the voluntary manslaughter–self-defense instruction. Specifically, there was no evidence that at the time of the killing defendant actually believed he or anyone else was in imminent danger of death or great bodily injury and that he actually believed the immediate use of force was necessary to defend against an imminent danger. The undisputed evidence was that the people

35

outside drove off and that after the unidentified family member left with defendant's mother and sister, defendant and Glaze were alone in the house. At the time defendant shot Glaze, Glaze was crouching down, digging through a pile to look for socks.  Defendant's own description of his state of mind expressed fear about future possible harm but not imminent danger. The trial court correctly determined that substantial evidence did not support a voluntary manslaughter–imperfect self-defense instruction.

### D. Habitation Defense (CALCRIM No. 506) and Presumption Regarding Use of Force Against Intruder into Home (CALCRIM No. 3477)

Defendant asserts the trial court erred by failing to instruct sua sponte on the affirmative defense of habitation under CALCRIM No. 506 and CALCRIM No. 3477.  CALCRIM No. 506 (justifiable homicide–defending against harm to person within home or on property) would have instructed the jury that defendant was not guilty of murder if he killed to defend himself or another person in his home and that the killing was justified if: (1) defendant reasonably believed that he was defending his home against Glaze, who intended or tried to commit robbery; (2) defendant reasonably believed the danger was imminent; (3) defendant reasonably believed that the use of deadly force was necessary to defend against the danger; and (4) defendant used no more force than was reasonably necessary to defend against the danger.  (CALCRIM No. 506.)  The instruction further states: "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of violence to (himself . . . [or] someone else).  Defendant's belief must have been reasonable and [he] must have acted only because of that belief.  The defendant is only entitled to use the amount of force that a reasonable person would believe is necessary in the same situation.  If the

36

defendant used more force than was reasonable, then the killing was not justified." (CALCRIM No. 506, 2d bracketed insertion added.)

For the same reasons discussed *ante* (pt. III, sec. C), there was no substantial evidence that defendant believed he was in imminent danger of violence. Nor was there substantial evidence that defendant reasonably believed it was necessary to use deadly force to defend against an imminent danger. Instead, defendant explained repeatedly that he shot Glaze because he was afraid Glaze would come back and hurt his mother or sister. No substantial evidence supported CALCRIM No. 506, and the trial court had no obligation to give it. (*People v. Brooks* (2017) 3 Cal.5th 1, 73 [court is obligated to instruct on affirmative defense if there is substantial evidence of such a defense and the defense is not inconsistent with the defendant's theory of the case].)

Relatedly, defendant asserts that the trial court was also obligated to instruct sua sponte with CALCRIM No. 3477 (presumption that resident was reasonably afraid of death or great bodily injury; § 198.5). Section 198.5 creates a rebuttable presumption that a residential occupant has a reasonable fear of the imminent peril of death or great bodily injury when he or she uses deadly force against an intruder who unlawfully and forcibly enters his or her residence. CALCRIM No. 3477 would have instructed the jury that the law presumes the defendant reasonably feared imminent death or great bodily injury to himself or a member of his household if: (1) an intruder unlawfully and forcibly entered his home; (2) the defendant knew or reasonably believed that the intruder unlawfully and forcibly entered the defendant's home; (3) the intruder was not a member of the defendant's household; and (4) the defendant used force intended to or likely to cause death or great bodily injury to the intruder inside the home.

37

No substantial evidence supported the threshold requirements of this presumption, which are that Glaze entered defendant's home unlawfully and forcibly. The evidence was to the contrary. Defendant's opening brief even acknowledges that Glaze "initially entered with consent . . . ." Defendant testified that Glaze regularly came to his home, slept there, wore defendant's clothes, used his shower and ate his food. On the night of the murder, Glaze knocked on the door, defendant answered, Glaze came in, and they went to "hang out" in defendant's bedroom. Later, defendant gave him leftovers to eat. Defendant contends that the fact Glaze was asked to leave and did not immediately do so was a withdrawal of consent to enter and his presence then became unlawful and forceful. He again states that when defendant was told to leave, he "ripped off his shirt and adopted a fighting stance." As discussed *ante*, the record citations provided by defendant do not reference "a fighting stance."

Defendant cites to the concurring and dissenting opinion in *People v. Brown* (1992) 6 Cal.App.4th 1489 in support of his contention that " 'forcible entry' " under Penal Code section 198.5 has the same meaning as in Code of Civil Procedure section 1159, which provides: "Every person is guilty of a forcible entry who either: [¶] (1) By breaking open doors, windows, or other parts of a house, or by any kind of violence or circumstance of terror enters upon or into any real property. [¶] (2) Who, after entering peaceably upon real property, turns out by force, threats, or menacing conduct, the party in possession." (Code Civ. Proc., § 1159, subd. (a); *Brown, supra*, 6 Cal.App.4th at p. 1500 (conc. & dis. opn. of Blease, Acting P. J.).) Even if we assume Code of Civil Procedure section 1159's definition of "forcible entry" applies when evaluating evidence under Penal Code section 198.5, this does not help

defendant. There is no evidence that Glaze engaged in any violence either to enter defendant's home or to force defendant from his home.

Defendant also cites *People v. Hardin* (2000) 85 Cal.App.4th 625, as an example of a case where an intruder did not use physical force to enter but instead ran past a 79-year-old woman who was standing on her porch and then "burst into her house . . . ." (*Id.* at p. 634.) When police arrived, the defendant threatened to kill the woman and hit her on the head with a hammer. (*Id.* at p. 627.) The Court of Appeal stated, "When defendant burst into her house, [the victim] would be presumptively justified in fearing that the unlawful entry entailed a threat to her life and safety," and under section 198.5, her use of force would be presumptively reasonable. (*Id.* at p. 634.) Notably, the defendant in *Hardin* admitted his entry into the victim's home was "forcible," although he argued it was " 'a mere trespass . . . .' " (*Id.* at p. 632.) Thus, *Hardin* does not support defendant's position. Further, it is distinguishable because here Glaze did not "burst into" defendant's home as in *Hardin*. (*Id.* at p. 634.) Instead, he knocked on the door and entered consensually. (*People v. Wilson* (2021) 67 Cal.App.5th 819, 829–830 ["an unlawful and forcible entry into a residence is a predicate to application of the [§ 198.5] presumption" (italics omitted)].)

Viewing the evidence in the light most favorable to the defendant, the record shows that Glaze consensually entered defendant's home and did not immediately leave after defendant, suspecting Glaze was trying to set him up for a robbery, became angry and told Glaze to leave. The section 198.5 presumption does not apply under these circumstances. The trial court had no sua sponte obligation to instruct with CALCRIM No. 3477.

**IV.** *There was no prosecutorial misconduct.*

During closing argument, the prosecutor argued against the defense theory that Glaze came to rob defendant's family. Defendant contends the argument was reversible prosecutorial misconduct because the prosecutor had successfully moved to exclude Glaze's social media message that he was "jackin' people . . . ." Defendant also argues the prosecutor improperly appealed to the jury's passions and sympathy when he argued that Sergeant Donahue was afraid of defendant. Defendant made no objection at trial to the portions of the closing argument which he now contends constituted prejudicial misconduct; thus, he has forfeited his claim. (*People v. Peterson* (2020) 10 Cal.5th 409, 464–465.) However, even if defendant had properly preserved his claim, we would find no prosecutorial misconduct.

### A. Additional Facts

During closing argument, the prosecutor argued: "So a question in this case—even though it's not a defense, all those instructions that were read to you, none of them talk about justifiable homicide. None of them talk about self-defense because there's no evidence of that. [¶] But one question in this case is did the defendant make a mistake about Bo? Was Bo there to stay the night or to steal? So we know Bo shows up in the rain with a bicycle with no shoes, no socks, and some machine that, apparently, he's wanting to sell. [¶] So if you think about that, how does it make sense that he's there to steal? He's got a bunch of junk that he's bringing to a house that he has been staying at. You know, what are you going to do? You're going to go in and steal something on your bike, steal something, leave this machine? You don't even have on shoes or socks. It doesn't make for a very good get-away." The prosecutor reminded the jury that "Bo was a homeless man" and that Bo

40

"denied any wrongdoing." He stated that although he did not have to prove Glaze innocent or guilty, "what you have is a pretty weak case against Bo."

Regarding Sergeant Donahue, the prosecutor argued, "You even had an officer get up here and testify, Officer [Sergeant] Donahue, about how he was afraid of the defendant back then. If an officer would be afraid of the defendant, shouldn't everybody have been afraid of the defendant?"

## B.    Analysis

Relying on *People v. Varona* (1983) 143 Cal.App.3d 566 and *People v. Daggett* (1990) 225 Cal.App.3d 751, defendant argues the prosecutor unfairly took advantage of the exclusion of Glaze's social media message, which defendant claims "would have convincingly established that he did indeed ride around on his bike to commit robberies." We disagree. Unlike in *Varona* and *Daggett*, here there was no " '*erroneous* evidentiary ruling[] on which the prosecutor improperly capitalized during his closing argument.' " (See *Peterson, supra*, at pp. 465–466 [distinguishing *Varona* and *Daggett* on the grounds that they involved *erroneous* evidentiary rulings and finding no misconduct where prosecutor argued in closing there was no evidence to support a proposition after trial court properly excluded evidence defense sought to introduce].) We found *ante* that the trial court did not err in excluding Glaze's message. Further, the prosecutor was permitted to question defendant's version of events during closing. (*People v. Williams* (1997) 16 Cal.4th 153, 221 [" ' "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom" ' "].) The prosecutor's argument questioning the likelihood that Glaze went to defendant's home to

rob his family properly referred to facts in the record and was not misconduct.

Nor did the prosecutor's references to Sergeant Donahue's statements improperly appeal to the sympathy or passions of the jury. The prosecutor argued that Donahue was afraid of defendant when he encountered him high on methamphetamine around the time of the murder. The prosecutor's purpose in referencing Donahue's testimony appears to have been to question defendant's story that Glaze went to rob defendant's family. We find the prosecutor's argument falls within the wide latitude afforded during closing argument. (*People v. Williams, supra*, 16 Cal.4th at p. 221.)

Because we find no misconduct, it is not necessary to reach defendant's argument that his counsel was constitutionally ineffective for failing to object during closing argument.

## V.     *Cumulative Error*

Defendant argues the multiple alleged errors had a cumulative prejudicial effect. As discussed *ante*, defendant has not established any prejudicial errors. Accordingly, individually and cumulatively, there was no reversible error.

## DISPOSITION

The judgment is affirmed.

_____

Jackson, P. J.

WE CONCUR:


_____

Simons, J.


_____

Langhorne, J.*

A161290/*People v. Michael Clarence Loftin*

_____

\* Judge of the Superior Court of Napa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

43